IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71224-1-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| PATRICK S. CRICK, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: June 8, 2015 |
| | ) | |

BECKER, J. — Patrick Crick appeals his conviction for child molestation in the first degree. He claims (1) the evidence does not support his conviction, (2) he was deprived of his right to a unanimous jury, (3) the court erred in denying his motions for mistrial based on incidents of juror misconduct, and (4) he was prejudiced by trial counsel's deficient performance. We reject these claims and affirm.

FACTS

In September 2012, K disclosed that Patrick Crick touched her breast and vaginal areas under her clothing one night during the summer of 2011 when she was 11 years old. The State charged Crick with child molestation in the first degree.

At trial, the testimony established that during the summer of 2011, K stayed for a period of time at the rural home Crick shared with his girlfriend, who is K's cousin, and the girlfriend's two children. K was close friends with R, the girlfriend's daughter. K liked spending time with R's family.

During this time, K and R set up a tent on the porch and slept there on some nights. One night, one or both girls asked Crick to come inside the tent with them before they fell asleep. Crick lay down between R and K. The three talked casually and then K fell asleep.

K testified that a short time later, she was awakened by someone moving inside the tent. She opened her eyes slightly and saw Crick bending over her. He touched her chest area underneath her bra. A minute or two later, he placed his hand underneath her shorts and underwear and touched her vaginal area. K was afraid, felt "frozen," and did not say anything.

Crick then moved over to where R was sleeping and "hunched" over her for a few minutes. He then kissed each girl on the forehead and left the tent. K tried to awaken R but was unable to do so. She cried herself to sleep.

The next day, K tried to act normally, but eventually told R what had happened. K asked R's mother if she could go home, but did not tell her the true reason she wanted to leave. R's mother told K she would have to wait because the family was already planning to go to K's home for a family birthday party a few days later.

K did not tell her parents or any other adults what happened because she was "scared and nervous" and "just wasn't thinking right." After that incident, K

did not return to R's house. K was not allowed to go to a subsequent family Christmas gathering because she failed to do a chore she was required to do. She was happy about this because she did not want to see Crick. K also told her family that she did not want R's family to come to a graduation party.

More than a year after the incident, in September 2012, K's parents found a note she had written about a month earlier when she was thinking about running away. In the note, she referred to the touching incident. K's parents confronted her about the note, and she disclosed the details of what happened in the summer of 2011. K's parents also made her tell R's mother what happened. Both R's mother and K's parents reported the incident to Child Protective Services.

R's mother remembered that R and K asked Crick to come into their tent one night in July 2011 when K was staying with the family. When Crick later came up to bed, he looked tired and told R's mother he had fallen asleep in the tent. Many months later, after she learned about K's allegations, R's mother confronted Crick, and he told her that before leaving the tent that night, he merely pulled down one of the girl's shirts. R also testified at trial but said she did not remember Crick ever coming into the tent, nor did she remember K telling her that Crick touched her.

Crick testified on his own behalf about the night he went into the girls' tent. Crick said that he inadvertently fell asleep with the girls. He said that when he woke up, he was disoriented. As he was leaving the tent, he noticed that K's shirt was pushed up and her stomach was showing. He pulled it down because it

3

was chilly. Then, he covered both girls with a blanket, kissed each one on the forehead, and left.

The jury convicted Crick as charged. He appeals.

## ANALYSIS

### Sufficiency of the Evidence

Crick challenges the sufficiency of the evidence supporting his conviction.

To prove that Crick committed child molestation in the first degree, the State had to prove that he had sexual contact with a person under age 12 and was at least 36 months older than K and not married to her. RCW 9A.44.083(1). "Sexual contact" is "any touching of the sexual or other intimate parts of a person" for the purpose of sexual gratification. RCW 9A .44.010(2). "Proof that an unrelated adult with no caretaking function has touched the intimate parts of a child supports the inference the touching was for the purpose of sexual gratification." State v. Powell, 62 Wn. App. 914, 917, 816 P.2d 86 (1991), review denied, 118 Wn.2d 1013 (1992).

When reviewing a sufficiency of the evidence challenge, the relevant question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

K's testimony on direct examination that Crick touched her breast and vaginal area underneath her clothing when she appeared to be sleeping supports Crick's conviction. Nevertheless, Crick points out that his own testimony directly contradicted K's account and that R, the only other person in the tent, could not corroborate K's claim about the touching nor remember a later conversation about it. Crick also claims that other testimony, including R's mother's testimony that K was acting normally after the alleged incident, undermines K's credibility. However, it is the jury's responsibility, not ours, to resolve conflicting testimony and evaluate witness credibility. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004), abrogated in part on other grounds, Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The jury was not required to accept Crick's version of the incident and was free to reject the inferences that Crick argues must be drawn from the evidence. Based on K's testimony, a rational trier of fact could find beyond a reasonable doubt that Crick committed the crime of molestation of a child in the first degree.

Jury Unanimity

Crick argues that when K testified that Crick first touched her breast area and then touched her vaginal area, she described separate and distinct incidents. Accordingly, he claims the trial court erred in failing to instruct the jury on the need to be unanimous.

A defendant may be convicted only when a unanimous jury concludes that he or she committed the criminal act charged in the information. State v. Petrich, 101 Wn.2d 566, 569, 683 P.2d 173 (1984), overruled on other grounds by State

v. Kitchen, 110 Wn.2d 403, 406, 756 P.2d 105 (1988). Where the State introduces evidence of multiple acts that could constitute the criminal act charged, the State must elect which of those acts it is relying on, or the trial court must instruct the jury that it must unanimously decide that the State proved the same criminal act beyond a reasonable doubt. Kitchen, 110 Wn.2d at 411. If neither of these alternatives occurs, a constitutional error arises because of the possibility that some jurors may have relied on one of the criminal acts while other jurors relied on another, resulting in a lack of unanimity on all of the elements necessary for a conviction. State v. Greathouse, 113 Wn. App. 889, 916, 56 P.3d 569 (2002), review denied, 149 Wn.2d 1014 (2003).

Although this rule applies when the State introduces evidence of multiple distinct acts, it does not apply when the evidence instead shows a continuing course of conduct. Petrich, 101 Wn.2d at 571. We apply common sense in analyzing whether the evidence shows a continuing course of conduct or several distinct acts, considering the time between each of the criminal acts and whether the acts involved the same people, occurred in the same location, and were done with the same ultimate purpose. State v. Love, 80 Wn. App. 357, 361, 908 P.2d 395, review denied, 129 Wn.2d 1016 (1996). Where the evidence shows a continuing course of conduct, the State need not elect which act it is relying on for the jury to convict; nor must the trial court instruct the jury that it must unanimously agree that the State proved the same criminal act beyond a reasonable doubt. Love, 80 Wn. App. at 361.

Crick did not propose a unanimity instruction at trial. But "the right to a unanimous verdict is derived from the fundamental constitutional right to a trial by jury and thus may be raised for the first time on appeal." State v. Handyside, 42 Wn. App. 412, 415, 711 P.2d 379 (1985).

Nevertheless, a commonsense view of the evidence confirms that K testified about one continuous touching incident and there was no need for either an election or a unanimity instruction. The child molestation here occurred at the same time and place—just moments apart in the tent. Each brief incident of sexual touching was done for the same purpose of sexual gratification. The trial court did not err in instructing the jury.

Motions for Mistrial

Crick contends that the trial court abused its discretion when it denied his motions for mistrial based on two separate jury incidents.

On the first day of trial, the court informed the parties after the lunch break that the jury coordinator received an e-mail from a juror who was not selected for the venire. That juror, who we will refer to as juror S, reported that after he was excused from the jury panel earlier that day, he took the elevator with two other excused jurors, one of whom said she observed the defendant mouth the words "'I didn't do this.'" Although juror S asked if the excused juror was planning to report the incident, it appeared that she did not plan to do so because she believed that others probably observed the conduct. Juror S also said the woman remarked that the defendant's action made him appear guilty. Although

he did not personally see anything, juror S decided that he should report the matter. Crick moved for a mistrial.

The court questioned each of the 13 jurors individually in the courtroom and talked with juror S by telephone. Each juror denied awareness of anyone, apart from the attorneys, attempting to provide information or pass along any message about the case. Each juror also denied overhearing any conversation about the case. The court determined that none of the sitting jurors appeared to have seen or heard about the conduct that the excused juror reported to juror S. And in any event, the court noted that the prejudice was unclear given that Crick was contesting his guilt by entering a plea of not guilty. The court denied Crick's motion for a mistrial.

Later the same day, the court received a second e-mail from a sitting juror. In the e-mail, juror 1 said that after lunch, another member of the jury asked if he had "certain feelings" about the case but denied engaging in any further discussion about the case. The court questioned juror 1, who confirmed that another juror had asked him if he was "swinging to the different sides." Juror 1 replied he did not know and moved on to different topics.

Crick renewed his motion for a mistrial. The court then questioned the other juror, juror 4, who admitted that she made a general statement along the lines of "sure hope the person is not guilty. You hate to see somebody's life ruined." The court determined that juror 4 discussed the case in violation of the court's orders and removed her from the jury panel. The court again denied

Crick's motion for a mistrial. The court noted that juror 1 did not engage in any inappropriate conversation and correctly reported the matter.

Crick contends that the court erred in denying his motions because both incidents involved jury misconduct warranting a new trial. "As a general rule, the trial courts have wide discretionary powers in conducting a trial and dealing with irregularities which arise. A mistrial should be granted only when . . . the defendant has been so prejudiced that nothing short of a new trial can insure that [the] defendant will be tried fairly." State v. Gilcrist, 91 Wn.2d 603, 612, 590 P.2d 809 (1979). We will disturb a court's decision on a motion for mistrial only if the court abused its discretion. State v. Balisok, 123 Wn.2d 114, 117, 866 P.2d 631 (1994).

Crick claims that the court's investigation into the first incident involving his alleged attempt to communicate with the jury revealed that at least two jurors were biased against him and inappropriately discussed his conduct and probable guilt. The chief problem with Crick's argument is that none of the members of the venire who were reportedly involved in the conversation or overheard the conversation were seated on the jury. Only three excused jurors were in the elevator, and each sitting juror denied having seen or heard anything about the case apart from the lawyers' statements. So even assuming Crick could establish incurable prejudice based on his own conduct of attempting to communicate his innocence, the court fully investigated the matter and that investigation provided no basis to conclude that the reported incident affected the jury.

With regard to the second incident, Crick fails to explain why the court's dismissal of juror 4 did not adequately address the potential prejudice caused by any misconduct. Nothing in the record indicates that juror 4 gave her opinion or imparted any prejudicial information to juror 1 or to any other juror. And contrary to Crick's argument, it is not clear that the conversation between the jurors took place before the court questioned each individually nor is it clear why the sequence makes a difference. When individually questioning the jurors, the court was attempting to discover whether they were aware of an attempt to impart information about the case and the court did not specifically inquire about whether anyone had asked about their feelings or opinions.

The court acted within its discretion in denying both of Crick's motions for a mistrial.

Ineffective Assistance of Counsel

Finally, Crick argues that he was deprived of the effective assistance of counsel because his trial counsel failed to request a unanimity instruction and was "admittedly" unprepared for trial.

To establish ineffective assistance of counsel, a defendant must overcome a strong presumption that counsel was effective by demonstrating that (1) counsel's performance was deficient by an objective standard of reasonableness and (2) the deficient performance prejudiced him. Strickland v. Washington, 466 U.S. 668, 687-89, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Deficient performance prejudices a defendant if there is a "reasonable probability that, but

for counsel's deficient performance, the outcome of the proceedings would have been different." State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

As previously explained, Crick was not entitled to a unanimity instruction. Therefore, his counsel did not perform deficiently by failing to request one. Nor is there anything in the record to suggest that Crick's counsel rendered constitutionally deficient performance due to lack of preparation. It is true that in arguing in support of a continuance before trial, Crick's counsel stated that he was unprepared to try the case because he had inadequate time to review written transcripts of previously provided recorded witness interviews, having just received the newly-prepared transcripts a few days before trial. But there is no evidence that counsel was actually unprepared or that Crick was prejudiced. Counsel acknowledged that he received the recorded witness interviews approximately six months earlier and had listened to the material. At the start of trial, counsel also acknowledged that he had the transcripts of the recorded interviews over the weekend before trial. Defense counsel used the transcripts at trial during cross-examination. Crick does not identify any discrepancy between the recorded versions of the interviews and the transcripts or any deficiency in counsel's performance caused by inadequate review of the transcripts. And beyond generally asserting that the "theory of defense likely suffered," he fails to establish any reasonable probability that the outcome of the trial would have been different had counsel had more time to review the transcripts.

Affirmed.

WE CONCUR:

Becker, J.

Leach, J.

Appelwick, J.